FILED

March 29 2016

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0549

DA 15-0549

IN THE SUPREME COURT OF THE STATE OF MONTANA

2016 MT 73

IN THE MATTER OF:

K.B.,

      A Youth in Need of Care.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. DDN 2012-73
Honorable James P. Reynolds, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Robin Meguire, Attorney at Law, Great Falls, Montana
          (*Attorney for J.R.B./Father/Appellant*)

          Mark Alan Mackin, Attorney at Law, Helena, Montana
          (*Attorney for K.B.*)

      For Appellee:

          Timothy C. Fox, Montana Attorney General, Micheal S. Wellenstein, Assistant Attorney General, Helena, Montana

          Leo Gallagher, Lewis and Clark County Attorney, Ann Penner, Deputy County Attorney, Helena, Montana

Submitted on Briefs:  February 24, 2016

Decided:  March 29, 2016

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1    K.B.'s father, J.B. (Father), appeals from an order entered by the First Judicial District Court, Lewis and Clark County, terminating his parental rights. We affirm.

¶2    Father presents the following issues for review:

1. *Whether the District Court lacked subject matter jurisdiction over K.B.'s abuse and neglect proceeding.*

2. *Whether Father received ineffective assistance of counsel.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3    K.B. was born in 2007 and is the daughter of Father and M.H. (Mother). K.B. was living with Mother when she was removed from Mother's care by the Department of Public Health and Human Services (the Department) on November 26, 2012, due to concerns regarding Mother's ability to care for her and protect her from domestic violence. K.B. was placed in kinship foster care with her Aunt and Uncle, where she has remained. K.B.'s younger sister, T.H., also lives with Aunt and Uncle. K.B. was adjudicated a Youth in Need of Care on May 30, 2013. The Department drafted a treatment plan for Father. Father requested the name of the treatment plan be changed. The typewritten words "Treatment Plan" were stricken from the title with a pen. Above "Treatment Plan" the handwritten word "Checklist" was inserted. Otherwise, the substance of the document remained unchanged. The District Court referred to the document afterwards as the "non-offending parent checklist." Father signed the document on June 25, 2013, and the District Court approved it. Summarized, its tasks required Father to:  1) remain law abiding; 2) address his substance abuse issues; 3)

2

establish a safe, stable home and obtain employment; 4) maintain visitation with K.B.; and 5) remain in contact with the Department.

¶4 The Department filed petitions to terminate Mother and Father's rights on May 12, and September 29, 2014, respectively. On April 15, 2015, the District Court held a termination hearing. At the hearing, Mother consented to termination and relinquished her parental rights to K.B. Father opposed his termination, but did not argue he should be given custody of K.B. Instead, he asked the District Court for an additional six months to accomplish the tasks on his "checklist" before he could become a placement option for K.B.

¶5 At the termination hearing, evidence presented to the District Court showed that K.B. flourished while living with Aunt and Uncle during the 29 months preceding the termination hearing. At the time of the hearing, Aunt and Uncle wished to adopt K.B. and T.H. K.B.'s school principal testified that K.B.'s behavior and demeanor had drastically improved since being placed with Aunt and Uncle, who are very active in parenting her. K.B.'s kindergarten and first grade teacher testified that K.B. was initially a very angry and isolated student. Later, she testified, K.B. became a pleasant, eager to please student with vastly improved behavior. K.B.'s current, second grade teacher testified that she had not observed some of K.B.'s initial behavioral issues that others had witnessed and reported to her. She testified K.B. likes to be in control, is a pleasant student, and she enjoys having K.B. in her class. K.B.'s Court Appointed Special Advocate testified that after many attempts, he was never able to get in contact with Father and that Father's termination was in K.B.'s best interests because of her need for

permanency. K.B.'s therapist testified that she had worked with K.B. since the beginning of 2013. In that time, she testified, K.B. had made substantial progress in her behavior and self-confidence.

¶6 Michelle Silverthorne (Silverthorne), Child Protection Specialist, has been K.B.'s case worker since her removal. At the termination hearing, Silverthorne testified that she initially looked to Father as the "non-offending" parent for K.B.'s placement, as is customary when a child is removed from one custodial parent. However, she did not think Father was an appropriate or safe choice because he admitted to her that he could not financially support K.B. or provide her a place to live. Also, Father was on probation as a result of an earlier conviction of partner-family member assault. When asked about the Department's policy with regard to a treatment plan for a non-offending parent, Silverthorne responded:

> Well, if the non-offending parent is unable to take care of the child, then we still go forward with trying to get the child adjudicated as a Youth in Need of Care and then developing a treatment plan to get that parent to the point where they can parent the child full time.

She testified that it was under this policy that she proceeded in developing a treatment plan for Father.

¶7 As of the termination hearing, Silverthorne testified that Father's treatment plan had not been successful. Father had been incarcerated recently, had stopped visiting K.B., and failed to remain in contact with Silverthorne. Father's visitation rights were suspended because reports alleged, and K.B. confirmed, that he had left K.B., age six, at a carousel alone while he went to pick up his girlfriend. Also, another report

4

alleged Father was abusing methamphetamines. During the summer of 2014, Silverthorne and Father's attorney each notified Father that his unsupervised visits would be suspended until he underwent urinalysis testing. At the time of the termination hearing, Father had not had contact with K.B. since mid-2014, except for one visit made while K.B. was in the hospital recovering from a tonsillectomy. Silverthorne testified that Father had not called or visited her office to see why his visitation had been suspended, although he knew her phone number, which had not changed, and knew where her office was located. Silverthorne testified that as a result of not being in contact with Father, she had no way to verify whether he had established safe, stable housing or employment. Silverthorne testified that she did not believe Father would be able to turn his situation around in a reasonable amount of time to adequately care for K.B. Silverthorne testified that K.B. is well-bonded and feels safe with Aunt and Uncle. Silverthorne testified that termination of Father's rights was in K.B.'s best interests, especially her need for permanency.

¶8     Father testified at the termination hearing and explained he was not allowed to see K.B. from August 2014 until February 2015 and he did not know why. He testified he had been told to call Silverthorne to find out and had tried to on several occasions, but had failed to reach her or get a call back from her. Father testified he had no issue taking a drug test, as he had been tested regularly while on probation. He also testified that he did not believe he should be required to undergo drug testing. Father testified he was employed part-time and was planning on moving to Butte where he believed he would be offered a full-time job.

¶9 At the end of the termination hearing, the District Court terminated Father's rights from the bench. On July 23, 2015, the District Court issued its findings of fact, conclusions of law, and order terminating Father's parental rights pursuant to § 41-3-609(1)(f), MCA. In its order, the District Court concluded that clear and convincing evidence established that a treatment plan for Father had been approved, but had not been successful and that the condition rendering Father unfit was unlikely to change within a reasonable amount of time. The District Court also concluded that clear and convincing evidence established that K.B.'s best interests would be served by terminating Father's parental rights and awarding the Department permanent legal custody with the lawful authority to consent to her adoption. Father appeals.

## STANDARD OF REVIEW

¶10 Whether a district court possesses subject matter jurisdiction is a question of law, which we review de novo. *In re B.W.S.*, 2014 MT 198, ¶ 10, 376 Mont. 43, 330 P.3d 467 (citation omitted). This Court exercises plenary review of whether a parent was denied effective assistance of counsel. *In re B.M.*, 2010 MT 114, ¶ 22, 356 Mont. 327, 233 P.3d 338; *In re J.J.L.*, 2010 MT 4, ¶ 14, 355 Mont. 23, 233 P.3d 921.

## DISCUSSION

¶11 *1. Whether the District Court lacked subject matter jurisdiction over K.B.'s abuse and neglect proceeding.*

¶12 Father argues the District Court lacked subject matter jurisdiction to terminate his parental rights because the court never approved a treatment plan for him under § 41-3-609(1)(f), MCA, and because he was a "non-offending" parent. "Subject-matter

jurisdiction is a court's fundamental authority to hear and adjudicate a particular class of cases or proceedings." *Lorang v. Fortis Ins. Co.*, 2008 MT 252, ¶ 57, 345 Mont. 12, 192 P.3d 186 (citations omitted). "Subject matter jurisdiction of the district courts is established by the Montana Constitution." *Lorang*, ¶ 56 (internal quotations and citation omitted). Particularly, Article VII, Section 4(1) provides that district courts have "original jurisdiction in . . . all civil matters." Therefore, a district court's subject matter jurisdiction is extremely broad and covers "all civil matters," including child abuse and neglect proceedings. A court's subject matter jurisdiction is not affected by a court's failure to follow statutory requirements. *See B.W.S.*, ¶ 13 (citations omitted).

¶13 Father argues the District Court lacked subject matter jurisdiction to terminate his parental rights because his "checklist" did not satisfy the requirements of § 41-3-609(1)(f), MCA. However, conformity with the statute is unrelated to a court's authority to hear child abuse and neglect cases. Trial courts have subject matter jurisdiction over child abuse and neglect proceedings because they are "civil matters."

¶14 Subject matter jurisdiction over child abuse and neglect proceedings is conferred to the district courts by the Montana Constitution, not by statute. Even if the court failed to follow § 41-3-609(1)(f), MCA, it would nevertheless still have subject matter jurisdiction over the termination proceeding affecting K.B. Pursuant to § 41-3-103(1), MCA, "a person is subject to a proceeding under [the child abuse and neglect statutes] and the district court has jurisdiction over: (a) a youth who is within the state of Montana for any purpose;" and "(d) a youth or a youth's parent . . . who resides in Montana . . . ." Therefore, there is no requirement that a parent be an "offending" parent before a court

7

may make decisions regarding the best interests of a child suspected of having been abused or neglected. Jurisdiction is conferred by virtue of the youth being within the state of Montana, and that jurisdiction extends to a parent pursuant to the provisions of § 41-3-103(1), MCA. The District Court correctly concluded it had subject matter jurisdiction over K.B.'s child abuse and neglect proceeding and authority to terminate Father's parental rights.

¶15     2. *Whether Father received ineffective assistance of counsel.*

¶16     "[P]arents have a due process right to effective assistance of counsel in termination proceedings." *In re A.S.*, 2004 MT 62, ¶ 20, 320 Mont. 268, 87 P.3d 408. Whether assistance was effective requires review of counsel's training, experience, and advocacy. *B.M.*, ¶ 22 (citation omitted). Ineffective assistance of counsel requires reversal only if the parent suffered prejudice. *B.M.*, ¶ 22 (citation omitted).

¶17     Father argues he received ineffective assistance of counsel because of his counsel's inadequate advocacy of Father's interests. Specifically, Father believes his counsel rendered ineffective assistance when he failed to object: (1) to K.B. being adjudicated a Youth in Need of Care; (2) to the District Court's characterization of his "checklist" as a treatment plan; and (3) to the District Court exercising subject matter jurisdiction over K.B.'s proceeding. We address each contention in turn.

     A. *Youth in Need of Care Adjudication*

¶18     On May 30, 2013, Father stipulated to the District Court's adjudication of K.B. as being a Youth in Need of Care. A Youth in Need of care is a youth who has been determined to be, or have been, abused, neglected, or abandoned. Section 41-3-102(34),

8

MCA. In his stipulation, Father admitted "that the State could prove by a preponderance of evidence that the youth is abused and neglected within the meaning of Mont. Code Ann. § 41-3-102 based upon the facts contained in the Affidavit of the Child Protection Specialist." Child Protection Specialist Michelle Young filed an affidavit that included evidence that Mother was subjecting K.B. to domestic violence and drug abuse, by Mother's use of methamphetamines. The affidavit alleged both of Mother's children had fathers who were convicted of partner-family member assault while living with K.B. The affidavit alleged K.B. then "age 5, has had significant exposure to domestic violence her entire young life" and that both K.B.'s father and her sister's father had received at least three charges of partner-family assault, for allegedly assaulting Mother. The affidavit alleged that K.B. had witnessed Mother and T.H., then age three, being beaten, hit, and kicked. The affidavit further stated that T.H.'s father, while incarcerated, accused Mother of physically abusing T.H. by kicking her in the face.

¶19 Had Father not stipulated and insisted on a contested hearing, the State was ready, willing, and able to present testimony regarding these allegations. The evidence was substantial and would have established by a preponderance that K.B. was a Youth in Need of Care. Thus, any objection or insistence by Father's counsel to have a contested hearing, even assuming for the sake of argument that it constituted deficient performance by counsel, could not have prejudiced Father. Moreover, Father misunderstands the focus of child abuse and neglect proceedings—the child. He mistakenly argues that K.B. could only have been adjudicated a Youth in Need of Care "as to" Mother and not "as to" him because K.B. was living with Mother when she was removed. A child is not

9

determined to be a Youth in Need of Care "as to" anyone. The child is adjudicated a Youth in Need of Care because he or she is being, or have been, abused, neglected, or abandoned. The District Court had sufficient evidence to adjudicate K.B. a Youth in Need of Care. Father cannot show he suffered prejudice as a result of his counsel's failure to object to that determination.

*B. "Checklist" or "Treatment Plan"*

¶20 On June 25, 2013, Father signed and the District Court approved a document prepared by the Department as a treatment plan. Father asked that the document be renamed. The words "Treatment Plan" were marked through and replaced with the word "Checklist." On appeal, Father contends his counsel was ineffective in failing to object to the District Court's characterization of this document as a treatment plan. He argues that retitling the document changed its substance. We find Father's argument unpersuasive.

¶21 If a child is found to be a Youth in Need of Care, the court may "order the department to evaluate the noncustodial parent as a possible caretaker." Section 41-3-438(3)(b), MCA. The court may order a treatment plan for the child's parent if "the court has made an adjudication under 41-3-437 that the child is a youth in need of care." Section 41-3-443(1)(c), MCA. A treatment plan is a "written agreement between the department and the parent or guardian . . . that includes action that must be taken to resolve the condition or conduct of the parent or guardian that resulted in the need for protective services for the child." Section 41-3-102(30), MCA.

¶22 Here, the statute authorized the Department, following the court's determination that K.B. was a Youth in Need of Care, to evaluate Father as a noncustodial parent and possible caretaker for K.B. Similarly, the District Court was authorized by statute to order Father to comply with a treatment plan because K.B. was adjudicated a Youth in Need of Care. The document in question was prepared for Father as a treatment plan. It specified actions Father must take to resolve the need for protective services to be involved in K.B.'s life, and for Father to become an appropriate placement option for K.B. The document, by whatever name Father chooses to subscribe to it, constituted a treatment plan as defined by statute. Father has not shown he suffered prejudice as a result of his counsel's failure to object to the District Court's characterization of the so-called "non-offending parent checklist" as a treatment plan because the document constituted a treatment plan. As such, the document satisfied one of the requirements of § 41-3-609(1)(f), MCA, for termination of Father's rights.

### C. Subject Matter Jurisdiction

¶23 Father cannot show he suffered prejudice as a result of his counsel's failure to object to the District Court's subject matter jurisdiction because, as shown above, the District Court had subject matter jurisdiction over K.B.'s abuse and neglect proceeding.

### CONCLUSION

¶24 The District Court appropriately exercised subject matter jurisdiction over K.B.'s abuse and neglect proceeding. Father cannot demonstrate he received ineffective assistance of counsel.

11

¶25     Affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER
/S/ BETH BAKER
/S/ JIM RICE